UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALIITASI T ALAPATI,<br><br>          Plaintiff,<br><br>    v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>          Defendants. | Case No. 21-cv-04144-SI<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Re: Dkt. No. 42 |

Before the Court is defendants' Motion to Dismiss the Second Amended Complaint ("SAC"). Dkt. Nos. 42 (Motion filed Feb. 1, 2022); 39 (SAC filed Jan. 18, 2022). The Court previously determined that resolution of this motion would be appropriate without oral argument, and thus **VACATED** the hearing set for April 1, 2022 pursuant to Civil Local Rule 7-1(b). Dkt. No. 50. Based on a careful review of the SAC, the Motion to Dismiss, and the arguments raised in the parties' respective briefings, the Court will **GRANT IN PART** and **DENY IN PART** defendant's Motion to Dismiss. Plaintiff is given leave to file an amended complaint no later than April 29, 2022.

United States District Court<br>Northern District of California

United States District Court
Northern District of California

# BACKGROUND

The claims in the SAC stem from an approximately two-week period in March 2019, when Aliitasi Alapati was incarcerated in the City and County of San Francisco's County Jail 2 ("CJ2"). The Court accepts as true the following factual allegations for purposes of the motion to dismiss.

## 1.       Alapati's intake and CJ2's laundry facility

Alapati came into CJ2's custody on September 9, 2018.  SAC ¶ 9.  The complaint does not specify whether Alapati was in pretrial detention or post-conviction incarceration.  At that time, Alapati was taking medication for heart, asthma, and allergy conditions.  *Id*.  Alapati's heart condition involved an aortic valve replacement ("AVR") which occurred in 2010.  *Id*.  Upon her intake at CJ2, Alapati informed medical staff at CJ2 of her heart condition and AVR, which required "critical attention and care" to "function properly and allow her to live."  *Id*.

In late February 2019, Alapati began working in the laundry department of CJ2.  SAC ¶ 11.  There, Alapati encountered items contaminated with human feces, vomit, urine, and blood.  *Id*.  Rather than segregating these items for a pre-rinse or sanitization, the laundry department "commingled" them with the other items to be laundered.  *Id*.  The department required Alapati to "wear a protective body suit while working" in the facility.  *Id*.

## 2.       Alapati's progression of symptoms and limited care

Around March 4, 2019, Alapati began experiencing swelling in her hands and knees, which she reported to defendant Nurse Joseph Williamson.  SAC ¶ 12.  Two days later on March 6, Alapati "began to feel body aches, her complexion turned from a healthy pale brown color to yellow, and her energy noticeable decreased."  *Id*. ¶ 13.  That day, medical staff evaluated Alapati and observed that she had low blood pressure, but further exams were not ordered.  *Id*.  Alapati was prescribed Tylenol by defendant Nurse Christa Gallagher.  *Id*.

The symptoms worsened.  The following day, on March 7, 2019, Alapati's "mobility became severely impaired," to the point where she could not raise herself up to her bunk bed.  SAC ¶ 14. CJ2 deputies helped bring Alapati's mattress to the floor and summoned medical staff.  *Id*.  The

medical staff who responded included defendant Nurse Giday Beshue.  *Id*.  Before assessing Alapati's condition, and in the presence of other deputies and nurses, Beshue grabbed her "wrist with extreme force and yanked [her] up from the ground and verbally accused her of faking her extreme symptoms." *Id*.

Alapati reported to CJ2's medical unit the next day, March 8, 2019, "because her pain symptoms, including dizziness, body aches and body fatigue, continued to increase in severity." SAC ¶ 15.  Defendant Nurse Evelyn Mendoza took Alapati's blood pressure and noted that it was abnormal, but prescribed only Tylenol, which Alapati "emphatically reported failed to alleviate her severe pain and discomfort." *Id*.

On March 9, 2019, Alapati received a visit from her sister, who, upon seeing Alapati, "became immediately concerned about" her wellbeing and implored her to go back to the medical unit.  SAC ¶ 16.  The following medical staff were "in charge" of Alapati's care that day: Dr. Sona Aggarwal, Nurse Thu Tran, Nurse Raphroger Gonzaga, and Nurse Karina Shannon.  *Id*.  "[D]espite Alapati's abnormal blood pressure readings, pale appearance, complaints of dizziness, weakness, nausea, hand swelling, foot pain, migraine, and chest pain, and medical history of AVR," she was again prescribed Tylenol.  *Id*.  Alapati's sister returned the following day, but Alapati's "physical pain and discomfort was so severe that she became immobile and thus unable to visit with her sister." *Id*. ¶ 17.  Alapati continued to report her complaints to CJ2 medical staff, which included defendant Nurses Rocio Babilonia, Haja Dumbuya, and Jessica Jimenez.  *Id*.  Despite Alapati's "abnormal temperature readings" and immobility, Nurses Rocio Babilonia, Haja Dumbuya, and Jessica Jimenez only provided Alapati with Tylenol, a water pitcher, and ice chips for relief.  *Id*.

On March 11, 2019, Alapati's sister "pleaded" to Alapati's defense attorney, Sylvia Nguyen, to visit Alapati in CJ2 and determine the status of her medical condition.  SAC ¶ 18.  Meanwhile, plaintiff reported complaints of "unresolved body aches and nausea…chills, experiencing sudden nose bleeds, abdominal cramps and painful urination" to medical staff, including Nurses Karina Shannon and Christa Gallagher.  *Id*.  Tylenol was again prescribed.  *Id*.

United States District Court
Northern District of California

### 3.     Medical staff transfer Alapati out of general population

On March 12, 2019, CJ2 medical staff transferred Alapati out of general population and into CJ2's medical unit.  SAC ¶ 19.  There, diagnostic tests revealed an "international normalized ratio" of 10.1.  *Id*.  The target ratio was between 2 and 3.  *Id*.  Alapati "continued to beg the medical staff," including Nurses Nicole Joe, Karina Shannon, Nicole Una, Joseph Williamson, Thu Tran, and Giday Beshue, to send her to the hospital rather than continuing to prescribe Tylenol.  *Id*.  Medical staff did not perform a physical exam, did not request, recommend, or perform diagnostic testing or imaging, did not recommend or request transfer to an E.R., and did not seek the opinion of other medical professionals.  *Id*. ¶ 20.

Alapati's defense attorney, Sylvia Nguyen, visited her the following afternoon, on March 13, 2019.  SAC ¶ 22.  Alapati was transported to the visit a wheelchair, had "severely discolored" complexion and was bleeding from her nose.  *Id*.  Upon seeing Alapati, Nguyen "demanded" she be transferred to a hospital.  Nurse Beshue refused Nguyen's request.  *Id*.

Later that night on March 13, however, Alapati was transferred to Zuckerberg San Francisco General Hospital, in the back seat of a sheriff's vehicle while handcuffed.  *Id*.

### 4.     Hospital doctors discover the cause of Alapati's ailments

 Medical staff at Zuckerberg General examined Alapati and diagnosed her with e-coli and sepsis infections and a compromised heart valve due to untreated infections.  SAC ¶ 23.  Had treatment been delayed any further, the medical staff opined, "the infections would have been fatal." *Id*.  Alapati remained in Zuckerberg General from March 13, 2019 to March 22, 2019, until she was transferred to California Pacific Medical Center to undergo open heart surgery to replace her compromised aortic valve.  *Id*. ¶ 24.  The replacement was "biological" rather than "mechanical," meaning Alapati would need to have the new valve replaced sooner than the original valve.  *Id*.

Alapati believes she contracted the infections from the "unsanitary practices in and about CJ2, including its laundry department."  SAC ¶ 25.  She believes the medical staff at CJ2 failed to exercise proper care in treating her throughout her ordeal, and instead "barraged" her with accusations that she was faking her symptoms, repeatedly provided ineffective treatment of Tylenol,

and thereby caused unnecessary pain and suffering including "great emotional and psychological harm." *Id.* ¶ 26-27.  Alapati also purports to live with anxiety and fear about the integrity of the biological valve that replaced her more durable mechanical valve.  *Id.* at 27.

### 5.    Alapati files her lawsuit

On September 2, 2019, Alapati filed a *pro se* grievance against the City and County of San Francisco ("CCSF") in a standard form pursuant to the claim presentation requirements of the California Tort Claims Act, Cal. Gov. Code § 900 *et seq.*  The complaint alleged:

> While at CJ2, Claimant expressed dire need for medical attention. The CJ2 medical staff, including NP Goodai, failed to provide adequate care, failed to diagnose / treat medical condition, and delayed appropriate medical care causing Claimant to endure prolonged exposure to untreated bacterial infections resulting in hospitalization, heart valve replacement surgery and ongoing recovery.

Dkt. No. 42-2 (Claim Against CCSF).[1]  Alapati then filed a lawsuit in San Francisco Superior Court on March 11, 2020.  Dkt. No. 1-1 (State Court Complaint).  Defendants removed the lawsuit to this Court on June 1, 2021.  Dkt. No. 1 (Notice of Removal).  Alapati, now represented by counsel, timely filed her second amended complaint on January 18, 2022.  Dkt. No. 3

The SAC names CCSF as a defendant, as well as several CJ2 medical staff, in both their individual and official capacities: Dr. Lisa Pratt, Dr. Sona Aggarwal, Nurse Christa Gallagher, Nurse Nicole Una, Nurse Taylor-Woodbury, Nurse Nicole Joe, Nurse Jessica Jimenez, Nurse Evelyn Mendoza, Nurse Raphroger Gonzaga, Nurse Thu Tran, Nurse Karina Shannon, Nurse Rocio Babilonia, Nurse Joseph Williams, Nurse Joseph Williamson (who may be the same person as Nurse Williams), and Nurse Haja Dumbuya.  The SAC also named Does 16 through 50, individually and in their capacities as employees or agents of CCSF.

Alapati's SAC presents fifteen causes of action against the various defendants:

//

---

[1] Per Fed. R. Evid. 201(b)(2), the Court takes judicial notice of Alapati's claim against CCSF.

United States District Court
Northern District of California

United States District Court
Northern District of California

| | Cause of Action | Asserted Against |
|---|---|---|
| **Claim 1** | 14th and 8th Amendment Violations of Right to Reasonable Safety and Freedom from Cruel and Unusual Punishment (42 U.S.C. § 1983) | All defendants |
| **Claim 2** | 8th Amendment Violation of Right to Bodily Integrity (42 U.S.C. § 1983) | All defendants |
| **Claim 3** | 14th and 8th Amendment Violations of Right to Medical Care (42 U.S.C. § 1983) | All defendants |
| **Claim 4** | 14th and 8th Amendment Violations via Bystander Liability (42 U.S.C. § 1983) | All defendants |
| **Claim 5** | Cal. Govt. Code § 900 *et seq.,* Negligence, Gross Negligence, Recklessness Vicarious Liability | All defendants |
| **Claim 6** | Entity Liability via *Monell* | CCSF only |
| **Claim 7** | Negligent hiring, training, and supervision | CCSF only |
| **Claim 8** | Intentional Infliction of Emotional Distress | All defendants |
| **Claim 9** | Negligent Infliction of Emotional Distress | All defendants |
| **Claim 10** | Assault & Battery | Nurse Beshue (CCSF mentioned) |
| **Claim 11** | Violation of Cal. Govt. Code § 845.6, Right to Medical Care | All defendants |
| **Claim 12** | Violation of Cal. Civil Code § 52.1, Bane Act | All defendants |
| **Claim 13** | Violations of Americans with Disabilities Act | CCSF only |
| **Claim 14** | Violations of Unruh Civil Rights Act | CCSF only |
| **Claim 15** | Violation of California Disabled Persons Act | CCSF only |

On February 1, 2022, defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the SAC for failure to state claim. The motion has been fully briefed and the Court will now address the factual sufficiency of the SAC.

**LEGAL STANDARD**

A motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6) challenges the legal sufficiency of the claims alleged in a complaint. To successfully counter a 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

1    *Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  To meet this standard, the complaint must allege

2    "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S.

3    662, 678 (2009).  The complaint must have sufficient factual content to allow the court "to draw the

4    reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  While the

5    complaint need not allege specifics, the facts contained must still suffice to "raise a right to relief

6    above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

7    When deciding whether a complaint satisfies the federal pleading standards, courts must

8    accept as true all factual allegations in a complaint.  *Iqbal*, 556 U.S. 678.  However, the presumption

9    of truth does not apply to "threadbare recitals" of the legal elements of a cause of action.  *Id*.

10   Similarly, "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

11   inferences" need to be accorded the presumption of truth when deciding a motion to dismiss.  *In re*

12   *Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).

13

14                                          **DISCUSSION**

15   1.    **Section 1983 claims based on the conditions of the laundry facility (Claims 1 and 2).**

16   Defendants assert the SAC fails to state a Fourteenth or Eighth Amendment claim against

17   all defendants based on the conditions of the laundry facility.  Dkt. No. 42 at 16.  The Court agrees.

18   Both the Eighth and Fourteenth Amendments require a claimant to establish "deliberate

19   indifference," but the standards for establishing "indifference" vary under the respective

20   Amendments.  *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1068 (9th Cir. 2016).  Under the Eight

21   Amendment, a prison official cannot be found liable unless the official *subjectively* knew of and

22   disregarded "an excessive risk to inmate health or safety."  *Id*.  The Fourteenth Amendment, in

23   contrast, imposes liability where a defendant fails to "take reasonable available measures to abate

24   that risk, even though a reasonable officer in the circumstances would have appreciated the high

25   degree of risk involved." *Id*. at 1071. Determining which standard applies turns on whether the

26   claimant's injury occurred during pre-trial detention or post-conviction incarceration – a fact not

27   alleged in the SAC.

28   Regardless of whether the Eighth or Fourteenth Amendment's deliberate indifference

United States District Court
Northern District of California

standard applies, the Court finds the SAC fails to state a claim against the Healthcare or Doe defendants arising from the laundry facility conditions.  The SAC does not state that the Healthcare or Doe defendants were personally involved in the operations or procedures of the laundry facility, or themselves invited Alapati to work there. *See Hines v. Youseff*, 914 F.3d 1218, 1228 (9th Cir. 2019) ("An official is liable under § 1983 only if 'culpable action, or inaction, is directly attributed to them.'").  Alapati concedes that dismissal of the Healthcare defendants is appropriate on this basis. Thus, the Healthcare defendants are dismissed with prejudice from Claims 1 and 2 to the extent those claims are based on the conditions of the laundry facility.  The Doe defendants are dismissed without prejudice.

CCSF is dismissed without prejudice as well.  To hold CCSF liable as a municipality, the SAC would need to allege "(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).  The SAC fails to allege that CCSF had a policy or custom in place with respect to the laundry facility conditions.

**2.      Section 1983 claims based on lack of policy and procedures (Claims 1 and 2)**

Defendants also assert the SAC fails to state a Fourteenth or Eighth Amendment claim against all defendants based on certain "policy and procedures."  Dkt. No. 42 at 16.  The Court agrees.

The SAC alleges that all defendants "knew or should have known that policy and procedures must be in place to adequately and reasonably accommodate inmates with life threatening medical conditions; and if such procedures were in place, they knew of should have known that failure to comply with said policy and procedures would constitute violations" of the Eighth and Fourteenth Amendments.  SAC ¶ 42, 51.  The SAC fails to state whether the Healthcare or Doe defendants were personally involved or had any say in whether such "policy and procedures" would be implemented. If the policies "were in place," the SAC fails to specify which policies and procedures were not

complied with.  The Healthcare and Doe defendants are thus dismissed without prejudice from Claims 1 and 2, to the extent those claims are based on the existence or non-existence of "policy and procedures." CCSF is also dismissed without prejudice, as the SAC fails to allege that the existence or non-existence of these policies or procedures was the "moving force" behind the asserted constitutional violation.

### 3.      Section 1983 claims based right to medical care (Claim 3)

Defendants argue the SAC fails to allege a constitutional violation of Alapati's right to medical care under the Fourteenth or Eighth Amendments.  Dkt. No. 42 at 18. To the extent the claim is brought under the Fourteenth Amendment, the Court disagrees.  However, dismissal of Claim 3 with leave to amend is appropriate to allow Alapati to specify which Amendment applies.

### A.      Fourteenth Amendment deliberate indifference

To prevail on a Fourteenth Amendment claim based on deficient medical care, a plaintiff must satisfy the following four elements:

> (1) The defendant made an intentional decision with respect to the conditions under which the [detainee] was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016). The third element incorporates the objective "deliberate indifference" standard, requiring "more than negligence but less than subjective intent—something akin to reckless disregard." *Id*.  Under this standard, "a plaintiff must show that the defendant 'disregard[ed] an excessive risk' to the plaintiff's health and safety by failing to take 'reasonable and available measures' that could have eliminated that risk." *Fraihat v.*

*U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 636 (9th Cir. 2021).

Here, the SAC asserts that defendants were deliberately indifferent to Alapati's "serious medical needs" from March 4, 2019 through March 13, 2019, which culminated in a bacterial infection and a compromised aortic valve, *id*. ¶ 57-60.  The SAC asserts upon Alapati's intake at CJ2, she "informed medical staff about her AVR because she was highly sensitive to the critical attention and care required for her mechanical aortic valve device to function properly and allow her to live."  SAC ¶ 9.  The Court may properly infer such a heart condition was noted in Alapati's medical records and charts, which would have been consulted in future interactions with medical staff.

The SAC alleges that, despite Alapati's preexisting heart conditions, the Healthcare defendants made an intentional decision to treat her with Tylenol, water, and ice chips, even as Alapati's subjective and objective symptoms escalated: body aches (beginning March 6), low energy and fatigue (beginning March 6), dizziness (beginning March 8), painful cramps and urination (March 11), pale appearance (March 6, again on March 9), low blood pressure (March 7, again on March 8, again on March 9), immobility (beginning March 7), abnormal temperature readings (March 10), and nose bleeds (beginning March 11).  An objectively reasonable healthcare provider, on notice of Alapati's medical needs because of the mention of her heart condition and AVR in her medical intake, would have "appreciated the high degree of risk involved" in repeatedly prescribing Tylenol and water as symptoms worsened over the course of a week.  The Court may infer that the delays "caused" Alapati's mechanical heart valve to fail.

Defendants assert the SAC fails to allege "personal involvement" as is required to hold each Healthcare defendant individually liable under section 1983.  Dkt. No. 42 at 21.  Defendants argue the SAC "neglects to allege the qualifications and decision-making power of any Healthcare Defendant such that they would have the clinical responsibility and authority to make an intentional decision regarding Plaintiff's care."  *Id*.  All that is required by section 1938, however, is that "each

defendant personally played a role in violating the Constitution," *Hines*, 914 F.3d at 1228, and the Court may infer that the following Healthcare defendants each "played a role" in the diagnosis and treatment provided to Alapati: Williamson, Gallagher, Beshue, Mendoza, Aggarwal, Tran, Babilonia, Dumbaya, Jimenez, Shannon, Joe, Una, Gonzaga, Pratt, and Taylor-Woodbury. There are no allegations at to Nurse Williams. Defendants further argue the "SAC does not allege facts imputing awareness of medical risk or reckless disregard of medical needs to each Healthcare defendant." Dkt. No. 42 at 21. Drawing inferences in Alapati's favor, however, the SAC indicates that all Healthcare staff would have been aware of Alapati's preexisting medical risk and needs, and would have been aware of the increasingly dire medical emergency through Alapati's recurrent complaints and visits.

### B.      Eighth Amendment deliberate indifference

The SAC would fail to allege an Eighth Amendment claim, which requires "a purposeful act or failure to respond to a prisoner's pain or possible medical need." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  Such purposefulness "may appear when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." *Id*.  The SAC fails to allege facts from which the Court may infer that the Healthcare defendants acted to purposefully deny, delay, or interfere with Alapati's medical treatment. *See, e.g*., *Colwell v. Bannister*, 763 F.3d 1060, 1068 (9th Cir. 2014) (medical staff were deliberately indifferent under the Eighth Amendment for denying plaintiff ocular surgery based on a policy that "require[d] an inmate to endure reversible blindness in one eye if he can still see out of the other.").

Based on the foregoing, the entirety of Claim 3 is dismissed with leave to amend against all defendants to specify Alapati's status and the applicable deliberate indifference standard.

**4.      Section 1983 claim based on bystander liability (Claim 4)**

Defendants assert the SAC fails to allege bystander liability against any defendants.  Dkt. No. 42 at 23.  The Court agrees.

State actors who are "mere bystanders" to a constitutional violation cannot be held liable under Section 1983.  *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1090 (9th Cir. 2011).  However, Section 1983 "liability extends to those who perform functions 'integral' to the [constitutional violation], even if their individual actions do not themselves rise to the level of a constitutional violation."  *Id*.  For example, in *Boyd v. Benton Cty.* the Ninth Circuit held that police officers who provided "armed backup during an unconstitutional search" in which a flashbang grenade was used "were 'integral' to that search," even if they did not themselves throw the grenade.  374 F.3d 773, 780 (9th Cir. 2004) (discussing *James by James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990)) ("[E]very officer was aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed.").

Here, the SAC merely alleges that defendants "witnessed other officers or jail personnel commit constitutional violations against Plaintiff, had an opportunity to intervene, and did not do so. The failure to act was objectively unreasonable and deliberately indifferent to Plaintiff's rights." SAC ¶ 70.  These conclusory allegations are not entitled to a presumption of truth. Even if the Court were to incorporate the foregoing allegations of the complaint, SAC ¶ 67, there would be no basis from which to infer that each and every defendant was an "integral participant" that "was aware of the decision" to deploy constitutionally dubious tactics, failed to "object to" that decision, and "participated in" the action "knowing" that such tactics would be deployed.  *Boyd,* 374 F.3d at 780

Claim 4 is thus dismissed as to all defendants with leave to amend.

**5.      Negligence, gross negligence, recklessness, and vicarious liability (Claim 5)**

Defendants assert the SAC fails to state a claim of negligence, gross negligence, or recklessness against any defendants, including vicarious liability against CCSF. Dkt. No. 42 at 36. The Court disagrees.

The elements of a negligence claim are: (1) a duty of care; (2) a breach of that duty; (3)

United States District Court
Northern District of California

causation; and (4) damages.  *Winebarger v. Pennsylvania Higher Educ. Assistance Agency*, 411 F. Supp. 3d 1070, 1091 (C.D. Cal. 2019).  The SAC alleges that Healthcare defendants owed Alapati a duty of care, SAC ¶ 75, breached those duties, SAC ¶ 76, and in doing so, caused harm to Alapati. SAC ¶ 80-82.  A negligence claim is thus stated against the Healthcare defendants,[2] with the exception of Nurse Williams, who is not mentioned in the SAC's factual allegations.  The SAC also states a claim based on gross negligence or recklessness, given the Court's analysis under the Fourteenth Amendment deliberate indifference standard *supra*, Claim 3.

No allegations are made against the Doe defendants; those defendants are dismissed with leave from Claim 5.

The SAC cannot state a claim against CCSF.  The California Government Code immunizes public entitles from tort liability "[a]n injury to any prisoner," with a few exceptions.  Cal. Govt. Code § 844.6.  Because the SAC fails to allege a proper statutory basis for overcoming section 844.6 immunity, CCSF is dismissed with leave to specify, if available, an applicable statutory exception.

**6.    Section 1983 liability against CCSF under *Monell* (Claim 6)**

Defendants argue the SAC fails to allege a *Monell* claim against CCSF.  Dkt. No. 42.  The Court agrees.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Municipal liability must instead be predicated on (1) a formal and express municipal policy, (2) a longstanding practice or custom, (3) a pronouncement by a decision-maker with final policymaking authority, or (4) a final policymaker's delegation of authority or ratification of a subordinate's

---

[2] It follows that the SAC states Negligent Infliction of Emotional Distress against the Healthcare defendants, in Claim 9. *See Varnado v. Midland Funding LLC*, 43 F. Supp. 3d 985, 990 (N.D. Cal. 2014) (quotation and citation omitted) (NIED "is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply.").  However the NIED claim cannot be maintained against CCSF due to the immunity of Cal. Govt. Code § 844.6; CCSF is accordingly dismissed with leave to specify an applicable statutory exception (if any is available). The Doe defendants are dismissed with leave for lack of factual allegations.

United States District Court
Northern District of California

decisions. *Scalia v. Cty. of Kern*, 493 F. Supp. 3d 890, 901 (E.D. Cal. 2019). In some instances, "inadequate training can justifiably be said to represent 'city policy.'" *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). A lack of proper or adequate training may state a *Monell* claim when, "in light of the duties assigned to specific" municipal employees, "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.*

A plaintiff must, in any event, establish that the alleged custom, policy, or practice is so "persistent and widespread" that it constitutes a "permanent and well settled" municipal policy. *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Id.*

Here, the SAC alleges that CJ2 medical staff and personnel "were improperly or inadequately trained in matters relating to the safety, bodily integrity, and medical care of inmates." SAC ¶ 94. The SAC fails to allege that the deficiencies in training encountered by Alapati were so "persistent and widespread" as to render them permanent and well-settled CCSF policy. *Trevino*, 99 F.3d at 918. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."); *Linder v. City of Emeryville*, No. C-13-01934 EDL, 2013 WL 5609319, at *2 (N.D. Cal. Oct. 11, 2013) (failure to state a failure-to-train *Monell* claim where plaintiff "relies on his own single incident, which is insufficient."). The SAC also fails to "specify the content of the policies, customs, or practices the execution of which gave rise to Plaintiffs' Constitutional injuries," and instead relies on threadbare recitals of the legal elements of failure-to-train claims. *Mateos-Sandoval v. Cty. of Sonoma*, 942 F. Supp. 2d 890, 899 (N.D. Cal. 2013), aff'd sub nom., 591 F. App'x 638 (9th Cir. 2015).

Claim 6 is dismissed with leave to amend.

14

**7.      CCSF's negligent hiring, training, and supervision (Claim 7)**

Defendants argue the SAC fails to state a claim against CCSF for negligent hiring, training, and supervision.  The Court agrees.

In California, "public entity tort liability is exclusively statutory."  *C.A. v. William S. Hart Union High Sch. Dist.*, 53 Cal. 4th 861, 868 (2012).  The California Tort Claims Act thus provides that, "[e]xcept as otherwise provided by statute," public entities are "not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."  Cal. Govt. Code § 815(a).  *See Williams v. Horvath*, 16 Cal.3d 834, 838 (1976) ("The California Tort Claims Act "confine[s] potential governmental liability to rigidly delineated circumstances: immunity is waived only if the various requirements of the act are satisfied.").  The SAC fails to allege the statutory basis for CCSF's direct liability for negligent hiring, training, and supervision of CJ2 medical staff and deputies.  Such a claim must be "founded on a specific statute either declaring the entity to be liable or creating a specific duty of care apart from the general tort principles embodied in Civil Code section 1714."  *de Villers v. Cty. of San Diego*, 156 Cal. App. 4th 238, 251 (2007).

Claim 7 is also procedurally barred.  The California Tort Claims Act requires that, before filing a state law claim for "money or damages" against a public entity, a claimant must present a "written claim" to the board of supervisors of the public entity.  Cal. Govt. Code § 945.4.  Section 915(a) sets forth the proper notification procedures. Alapati filed her written claim against CCSF on September 2, 2019.  Dkt. No. 42-2 (Claim Against CCSF).  The written claim, however, did not allege negligent hiring, training, or supervision. The "factual circumstances set forth in the written claim must correspond with the facts alleged in the complaint" subsequently field against the public entity.  *Fall River Joint Unified Sch. Dist. v. Superior Ct.*, 206 Cal. App. 3d 431, 434 (Ct. App. 1988) (dismissal is appropriate if the complaint "alleges a factual basis for recovery which is not fairly reflected in the written claim.").  Alapati's written claim alleges failure to provide care and treatment in her case, which is factually distinct from an injury resulting from a systemic municipal failure to hire, train, and supervise.

Claim 7 is dismissed with prejudice.

15

1

2 **8.      Intentional infliction of emotional distress (Claims 8)**

3        Defendants argue the SAC fails to show that all defendants intentionally inflicted emotional

4 distress onto Alapati.  Dkt. No. 42 at 32.  The Court agrees, with the exception of defendant Nurse

5 Beshue.  The Court further finds that Alapati failed to present the claim against CCSF in her written

6 claim pursuant to Section 915(a).

7        To state a valid claim for intentional infliction of emotional distress**,** a plaintiff must show

8 "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless

9 disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

10 extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

11 defendant's outrageous conduct."  *Pardi v. Kaiser Permanente Hosp., Inc*., 389 F.3d 840, 852 (9th

12 Cir.2004) (quoting *Cervantez v. J.C. Penney Co*., 24 Cal.3d 579 (Cal. 1979)).  Conduct is found

13 extreme or outrageous if it is "so extreme in degree, as to go beyond all possible bounds of decency,

14 and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id*. (quoting

15 *Cochran v. Cochran*, 65 Cal.App.4th 488, 545).  The requisite intent requires a showing that the

16 alleged conduct was "especially calculated to cause, does cause, mental distress of a very serious

17 kind."  *Ochoa v. Superior Court*, 703 P.2d 1, 4 n.5 (Cal. 1985).

18        "Ordinarily, a medical diagnosis and treatment advice will not be considered outrageous

19 unless they are false and given in bad faith."  *Berkley v. Dowds*, 152 Cal. App. 4th 518, 534 (2007).

20 The facts presented in the SAC against the Healthcare defendants do not allege that any of the

21 medical diagnoses or treatment prescriptions were "given in bad faith" or were "calculated to cause"

22 extreme emotional distress.  Accordingly, the claims based on the Healthcare defendant's medical

23 treatment—as lacking as those treatments might have been—do not state a claim of intentional

24 infliction of emotional distress.

25        The same cannot be said about Nurse Beshue, who forcibly yanked Alapati from the ground

26 and accused her of making up her symptoms.  Viewing the facts in the light most favorable to

27 Alapati, Claim 8 sufficiently states a claim against Nurse Beshue.

28        Alapati failed to include a claim of intentional infliction of emotional distress against CCSF

United States District Court
Northern District of California

in her written claim filed on September 2, 2019.  Dkt. No. 42-2 (Claim Against CCSF).  On this basis alone, CCSF is dismissed with prejudice from Claim 8.

### 9.     Assault and battery (Claim 10)

Defendants argue the SAC fails to allege a claim of assault and battery against Nurse Beshue. The Court disagrees.  To the extent Claim 10 attempts to include CCSF, however, the claim is barred against CCSF for lack of proper claim presentation under Section 915(a).

Under California law, assault is "[a]n unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  Cal. Penal Code § 240.  An assault does not require either an intent to physically injure or an actual physical injury, but only the reasonable apprehension of imminent harmful touching.  *Kiseskey v. Carpenters' Trust for So. California*, 144 Cal.App.3d 222, 232 (1983); *see Keum v. Virgin Am. Inc.*, 781 F. Supp. 2d 944, 953–54 (N.D. Cal. 2011).  Battery is "committed if there is unwanted intentional touching of any kind."  *Conte v. Girard Orthopaedic Surgeons Med. Grp., Inc.*, 107 Cal.App.4th 1260, 1266 (2003).  *See People v. Lopez*, 47 Cal.App.3d 8, 15 (1975) (describing battery as "a consummated assault.").

The SAC indicates that Nurse Beshue, upon entering Alapati's cell, "grabber her at or about the wrist with extreme force and yanked [her] up from the ground."  SAC ¶ 14.  This act satisfies the elements for battery, and by implication, the elements for assault.  Accordingly, the SAC adequately alleges assault and battery against Nurse Beshue.

### 10.    Right to medical care under Cal. Govt. Code § 845.6 (Claim 11)

Defendants argue the SAC fails to state a claim under California Government Code section 845.6 against any defendants.  The Court agrees.

Section 845.6 of the California Government Code creates blanket immunity for public entities or public employees who proximately injure a prisoner through their failure "to furnish or obtain medical care for a prisoner in his custody."  Cal. Govt. Code § 845.6.  Immunity for public entities and public employees is removed, however, when the "employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action

to summon such medical care." *Id*. The California Court of Appeal has remarked that "[s]ection 845.6 is very narrowly written to authorize a cause of action against a public entity for its employees' failure to summon immediate medical care only, not for certain employee's malpractice in providing that care." *Castaneda v. Dep't of Corr. & Rehab.*, 212 Cal. App. 4th 1051, 1070 (2013).

The allegations in the SAC undermine Alapati's claim under Section 845.6. The SAC alleges that from March 4, 2019 through March 13, 2019, medical staff at CJ2 evaluated her condition, took temperature and blood pressure readings, prescribed Tylenol, provided water and ice chips, modified her sleeping arrangement, and transferred her to CJ2's medical unit and ultimately Zuckerberg General. SAC ¶¶ 12-19. Although these diagnoses and treatments might have been wanting, the fact that care was tendered cannot, "as a matter of the plain meaning of the statutory language," be "characterized as a failure to summon medical care." *Nelson v. State of California*, 139 Cal. App. 3d at 81. *See Razon v. Cty. of Santa Clara*, No. 17-CV-00869-LHK, 2018 WL 405010, at *8 (N.D. Cal. Jan. 12, 2018) ("[O]nce an inmate is receiving medical care, § 845.6 does not create a duty to provide adequate or appropriate care.").

The Court accordingly dismisses Claim 11 with prejudice as to all defendants.

## 11. Bane Act violation under Cal. Civil Code § 52.1(b) (Claim 12)

Defendants argue the SAC fails to allege a Bane Act violation against all defendants. Dkt. No. 42 at 37. While the Court finds the claim sufficiently pled against Nurse Beshue, the SAC fails to allege a Bane Act claim against the remaining defendants.

Section 52.1(b) of the California Civil Code creates a cause of action against persons, including state actors, who interfere "by threat, intimidation, or coercion, or attempt[] to interfere by threat, intimidation, or coercion, with the exercise or enjoyment" of a person's constitutional or statutory rights under state or federal law. To properly allege a claim under the Bane Act, a claimant must demonstrate that the defendant acted with "a specific intent to violate" the constitutional right at issue. *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell v. City & Cty. of San Francisco*, 17 Cal. App. 5th 766, 800 (2017), as modified (Nov. 17, 2017)). *See Cornell,* 17 Cal. App. 5th at 800 ("Properly read, the statutory phrase 'threat, intimidation or

United States District Court
Northern District of California

1    coercion' serves as an aggravator justifying the conclusion that the underlying violation of rights is

2    sufficiently egregious to warrant enhanced statutory remedies, beyond tort relief."). To determine

3    whether the required intent exists, the finder of fact will ask: "Did the defendant commit the act in

4    question with the particular purpose of depriving the citizen victim of his enjoyment of the interests

5    protected by" the right at issue? *Cornell*, 17 Cal. App. 5th at 803. Notably, a defendant need not

6    "in fact recognize the [unlawfulness] of his act" to be found culpable. *Id*. Acting "in reckless

7    disregard of constitutional [or statutory] prohibitions or guarantees" is enough. *Id*.

8         Here, the SAC asserts that all defendants "violated Plaintiff's rights to due process with

9    deliberate indifference and thereby violated the Bane Act." SAC ¶ 129. The SAC further provides

10   that defendants interfered with Alapati's constitutional and statutory rights by "intentionally and

11   with deliberate indifference exposing Plaintiff to unsanitary and hazardous living conditions,"

12   "intentionally and with deliberate indifference imposing inadequate and improper medical care to

13   Plaintiff who was suffering from severe internal infection," and "intentionally and with deliberate

14   indifference depriving or preventing Plaintiff from receiving immediate and necessary medical care

15   and treatment for conditions relating to her aortic valve replacement." *Id.*

16        With the exception of Nurse Beshue, the SAC provides no facts from which the Court could

17   infer that the Healthcare defendants acted with "specific intent to violate" Alapati's constitutional

18   or statutory rights. The SAC does not allege the Healthcare defendants had control over the

19   purportedly "unsanitary and hazardous living conditions," or that the medical care which was

20   provided was given with a "particular purpose" of depriving Alapati of her rights. *See Cornell*, 17

21   Cal. App. 5th at 804 ("Subjective 'spite' was relevant here, along with all of the objective

22   circumstances surrounding the unlawful [act], both before it and after it."). The same cannot be said

23   about the allegations about Nurse Beshue. Taken as true, the facts alleged against Nurse Beshue, in

24   yanking Alapati from the ground and accusing her of faking symptoms, suffices to establish

25   "reckless disregard" of Alapati's right to receive medical care for her serious medical needs.

26        Thus, the SAC adequately alleged a claim against Nurse Beshue. The remaining Healthcare

27   defendants are dismissed without prejudice. The Bane Act claim cannot be sustained against CCSF,

28   because Alapati's written complaint against CCSF on September 2, 2019 failed to assert that any

United States District Court
Northern District of California

1    actions were taken to interfere with her constitutional or statutory rights. CCSF is dismissed with

2    prejudice from the Bane Act claim. The Doe defendants are dismissed without prejudice.

3

4    **12.    Americans with Disabilities Act (Claim 13)**

5           Defendant argues the SAC fails to allege a claim against CCSF under the Americans with

6    Disabilities Act ("ADA").  Dkt. No. 42 at 39.  The Court agrees.

7           An ADA violation is established when a plaintiff proves that (1) she is a "qualified individual

8    with a disability;" (2) "she was either excluded from participation in or denied the benefits of a

9    public entity's services, programs, or activities, or was otherwise discriminated against by the public

10   entity;" and (3) "such exclusion, denial of benefits, or discrimination was by reason of his

11   disability." *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001), as amended on denial of

12   reh'g (Oct. 11, 2001); 42 U.S.C. § 12132.  "[T]he statute's language unmistakably includes State

13   prisons and prisoners within its coverage."  *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206,

14   209 (1998).  When seeking monetary relief under the ADA, a plaintiff "must additionally prove

15   intentional discrimination as determined by the 'deliberate indifference' standard," which requires

16   first, "knowledge that a harm to a federally protected right is substantially likely," and second, "a

17   failure to act upon that likelihood." *Wilkins-Jones v. Cty. of Alameda*, No. C 08-1485 MHP, 2010

18   WL 4780291, at *4 (N.D. Cal. Nov. 16, 2010) (quoting *Duvall*, 260 F.3d at 1138).

19          Here, the SAC alleges Alapati's "heart condition, especially upon being exacerbated by the

20   internal infections," was a qualifying disability under the ADA, entitling her to "State and County

21   programs to provide access to medical health care services for patient-inmates of CJ2."  SAC ¶ 138.

22   139.  The crux of the ADA allegation is that CCSF discriminated against Apalati by failing to

23   provide her with reasonable accommodations to (i) live and work in "the unsanitary and hazardous

24   conditions at CJ2," (ii) access "adequate and proper medical care for an individual with a pre-

25   existing heart condition suffering from severe internal infection," and (iii) "effectively classify her

26   as an inmate with disability requiring necessary and specialized medical care and treatment for a

27   compromised heart condition." SAC ¶ 144.

28          The SAC adequately alleges Alapati's heart condition as a qualifying disability.  However,

United States District Court
Northern District of California

20

it fails to plead the other required elements of an ADA violation.  The SAC does not adequately allege which services, programs, or activities Alapati was denied or excluded from as a result of the alleged wrongful acts.  *See, e.g., Pierce v. Cty. of Orange*, 526 F.3d 1190, 1218-19 (9th Cir. 2008) (adequate ADA claim based on prison's failure to provide accommodations to allow prisoners to access "toilets, sinks, showers, hot water dispensers, telephones, and water fountains"); *Wilkins-Jones*, 2010 WL 4780291, at *6 (alleging failure to provide wheelchair denied prisoner mobility).

The Court infers that the "unsanitary and hazardous conditions" refers to the laundry facility (as no other conditions are alleged); but the SAC fails to allege that Alapati's access and use of the laundry facility was impaired—instead, the SAC alleges she worked there regularly with a body suit.  SAC ¶ 12.  The allegations based on deficient medical care also fail to state a claim because "[t]he ADA does not create a federal cause of action for prisoners challenging the medical treatment provided for their underlying disabilities." *Rosado v. Alameida*, No. Civ.03CV1110J (LSP), 2005 WL 892120, at *3 (S.D. Cal. Feb. 8, 2005).  To adequately plead an ADA claim based on medical care, the SAC would need to allege that Alapati "was discriminatorily precluded from access to medical treatment altogether." *Hughes v. Colorado Dep't of Corr.*, 594 F. Supp. 2d 1226, 1241 (D. Colo. 2009).  Such an allegation is not raised in the SAC.  *See also Anderson v. Cty. of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *5 (N.D. Cal. Sept. 13, 2010) ("[T]he mere provision of inadequate medical care does not state a claim under the ADA.").

The remaining allegations of aid, benefits, or services of which Alapati was denied are merely "threadbare recitals" of the legal elements of an ADA claim, and are thus not afforded a presumption of truth.  SAC ¶¶ 145, 146, 147.

Claim 13 is thus dismissed without prejudice.

### 13.    California Unruh Act (Claim 14)

Defendant argues the SAC fails to allege an Unruh Act claim against CCSF.  Dkt. No. 42 at 40.  The Court agrees.

The Unruh Act, codified in section 51(b) of the California Civil Code, entitles all people "to the full and equal accommodations, advantages, facilities, privileges, or services in all business

establishments of every kind whatsoever." Cal. Civil. Code § 51(b).  The California Supreme Court has asserted that the term "business" in the Unruh Act "embraces everything about which one can be employed, and it is often synonymous with calling, occupation, or trade, engaged in for the purpose of making a livelihood or gain." *O'Connor v. Village Green Owners Assn*., 33 Cal.3d 790, 795 (1983).  But "even in its broadest interpretation, the Unruh Act does not appear to apply to correctional facilities." *Wilkins-Jones*, 2010 WL 4780291, at *9.

Alapati agrees that the Unruh Act has no application here, but seeks "leave to amend to verify if any defendant either involved in medical care or at the jail facility was an employee of a 'private corporation that contracts with the County to provide services' to the CJ2 jail."  Dkt. No. 46 at 25 (quoting *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1043 (N.D. Cal. 2012)). Defendants oppose leave because Alapati "has been litigating this case for nearly two years and has had the opportunity to engage in discovery."  Dkt. No. 48 at 12.  Despite Alapati having had ample time to discover whether private actors were involved in her injury, "[d]ismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment."  *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008). That condition is not met here.

CCSF is dismissed with prejudice from Claim 14. The claim as a whole is dismissed with leave to amend to add qualifying businesses as defendants.

### 14.    California Disabled Persons Act (Claim 15)

Defendants argue the SAC fails to state a claim against CCSF under the California Disabled Persons Act.  Dkt. No. 42 at 40.  The Court agrees.

The California Disabled Persons Act ("DPA"), codified at Cal. Civil Code § 54-54.8, "is concerned solely with guaranteeing physical access to public spaces and not denial of services." *Montoya v. City of San Diego*, 434 F. Supp. 3d 830, 849 (S.D. Cal. 2020) (plaintiffs' allegation that they were denied "access to their rights to access city sidewalks and rights of way" stated a claim under DPA).  *See also, Anderson v. Cty. of Siskiyou*, No. C 10-01428 SBA, 2010 WL 3619821, at *6 (N.D. Cal. Sept. 13, 2010) (DPA "only guarantees physical access to a facility."); *Turner v. Ass'n*

*of Am. Med. Colleges*, 85 Cal. Rptr. 3d 94, 104 (Ct. App. 2008) (test administrators not required to provide accommodations for students with learning disabilities or attention disorders, "except to the extent necessary to guarantee physical access to the place in which the test is administered").

Here, the SAC incorporates prior factual allegations into Claim 15 but presents no new facts. SAC ¶153. However, no facts alleged in the SAC would establish that Alapati was denied physical access to any part of CJ2. At most, the allegations that CCSF denied "proper medical care" or failed "to classify her as an inmate with disability requiring necessary and specialized medical care and treatment for a compromised heart condition," SAC ¶ 144, would "amount to a denial of services, not a denial of physical access, and thus are not actionable" under the DPA. *Palacios*, 2020 WL 4201686, at *16. The allegations based on the laundry facility also do not allege a physical access barrier, only a lack of more robust sanitation practices.

Claim 15 is dismissed with leave to amend.

## CONCLUSION

The Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion to dismiss. In particular, the SAC adequately states the following claims against the following parties:

1. Fourteenth Amendment deliberate indifference to medical care claim against Healthcare defendants (Claim 3). However, Claim 3 is dismissed with leave to specify whether the Fourteenth Amendment furnishes the appropriate standard for Alapati's case.

2. Negligence claim against Healthcare defendants (Claim 5);

3. Intentional infliction of emotional distress claim against Nurse Beshue (Claim 8);

4. Negligent infliction of emotion distress claim against Healthcare defendants (Claim 9);

5. Assault and battery claim against Nurse Beshue (Claim 10);

6. Bane Act claim against Nurse Beshue (Claim 12).

The Court **dismisses with prejudice** the following claims against the following parties:

1. Fourteenth and Eighth Amendment claims against Healthcare defendants based on laundry facility conditions (Claims 1 and 2)

2. Negligent hiring, training, and supervision claim against CCSF (Claim 7)

23

3. Intentional infliction of emotional distress claim against CCSF (Claim 8)

4. Cal. Govt. Code § 845.6 claim against all defendants (Claim 11)

5. Bane Act claim against CCSF (Claim 12)

6. Unruh Act claim against CCSF (Claim 14)

The remainder the claims and parties in the SAC are dismissed without prejudice. Plaintiff is given leave to amend. **The amended complaint is due no later than April 29, 2022.**


**IT IS SO ORDERED**.

Dated: April 1, 2022

SUSAN ILLSTON
United States District Judge